IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


NYKA O'CONNOR,
          Plaintiff,

vs.                                   Case No.: 3:10cv360/LAC/EMT

KELLEY, et al.,
          Defendants.

_____/

## REPORT AND RECOMMENDATION

      Plaintiff in this action filed pursuant to 42 U.S.C. § 1983 is an inmate who proceeds pro se and prepaid the filing fee in full.  The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  *See* N.D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1)(B)(C); and Fed. R. Civ. P. 72(b).  Now before the court is the motion to dismiss filed by Defendants David A. Temples ("Temples") and Florida Department of Corrections ("FDOC") (together, "Defendants") (doc. 129).  Plaintiff has responded (doc. 141).  Also pending are the motion to set aside default filed by Nurse Grice ("Grice") (doc. 142), to which Plaintiff has responded (doc. 152), and Plaintiff's motion for default judgment against Grice (doc. 153).  Upon consideration, for the reasons given below the court recommends granting Defendants' motion to dismiss, granting Grice's motion to set aside default, and denying Plaintiff's motion for default judgment against Grice.  The court further recommends dismissing Plaintiff's claims against Grice and eleven other named Defendants as to whom service has not yet been effected.[1]

_____

[1]  Having prepaid the filing fee in full, Plaintiff does not proceed as a pauper under 28 U.S.C § 1915. Nevertheless, his complaint remains subject to the Prison Litigation Reform Act ("PLRA").  *Inter alia*, the PLRA authorizes dismissal of a complaint "in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity," on the basis that the complaint is frivolous, malicious, or fails to state a claim,

## I. PROCEDURAL HISTORY

Plaintiff is presently incarcerated at Union Correctional Institution but was housed at Santa Rosa Correctional Institution ("SRCI") when the events giving rise to this action took place in January 2010. Plaintiff initiated this case by filing a civil rights complaint that was docketed on September 13, 2010 (doc. 1). The court permitted Plaintiff to amend his complaint five times in an effort to state a viable claim for relief (docs. 27, 67, 88, 96, 106). The court ordered service of the fifth amended complaint and later granted Plaintiff's unopposed motion to file a sixth amended complaint (*see* docs. 119, 122, 123), which complaint was filed on October 21, 2013 (doc. 125 at 16).[2] In the sixth amended complaint, Plaintiff names as Defendants ten SCRI employees: Correctional Officer ("CO") Daniel C. Kelley ("Kelley"); CO Terry L. Nelson ("Nelson"); CO James A. Morris ("Morris"); Captain Jack N. Hammontree ("Hammontree"); Sergeant Temples; Lieutenant Orsa ("Orsa"); CO Brandon A. Turner ("Turner"); Lieutenant Donnie R. Ealum ("Ealum"); Lieutenant Joseph M. Mitchell ("Mitchell"), and CO Jerry T. Collier ("Collier"); Plaintiff also names as Defendants two SCRI nurses, Grice and Bishop, as well as the FDOC and SRCI, for a total of fourteen Defendants (doc. 125 at 1–3). Plaintiff, who is responsible for service of process in this case, effected service upon Temples, FDOC, and Grice but not Kelley, Nelson, Morris, Hammontree, Orsa, Turner, Ealum, Mitchell, Collier, Bishop, or SRCI. On November 25, 2013, Temples and FDOC filed their motion to dismiss (doc. 129); Plaintiff's response to the motion was docketed on December 26, 2013.[3] On December 19, 2013, the clerk entered a default against Grice (doc. 139), which on December 26, 2013, Grice

---

regardless whether the plaintiff has paid the filing fee. *See* 28 U.S.C § 1915A. The court therefore considers all of the sixth amended complaint's federal claims to assess whether they are frivolous, malicious, or fail to state a claim for relief.

[2] The page numbers cited in this Report refer to numbers assigned by the court's electronic docketing system, rather than those the parties may have designated.

[3] Plaintiff submitted 104 pages of exhibits with his response (doc. 141 at pp. 24–129). The exhibits include copies of Plaintiff's papers committing him to the custody of the FDOC; documents related to a "private administrative remedy"; an FDOC incident report (redacted, apparently by Plaintiff) dated January 21, 2010, pertaining to the use of force against Plaintiff on January 12, 2010; copies of administrative grievances; and a judgment and order of dismissal of a case Plaintiff filed in the United States District Court for the Middle District of Florida. At this pleading stage of the proceedings, exhibits generally are not considered—and have not been considered here—in determining whether the complaint states a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6).

moved to set aside (doc. 142). Plaintiff responded in opposition to Grice's motion (doc. 152) and moved for default judgment against her (doc. 153).

## II.  ALLEGATIONS AND RELIEF SOUGHT IN THE SIXTH AMENDED COMPLAINT[4]

Plaintiff asserts that at all times relevant to his claims, he was a "Mental Patient in FDOC" (doc. 125, Statement of Facts, ¶ 1). On January 12, 2010, while Plaintiff was on suicide watch and self-harm observation status due to his "Mental Disabilities such as depression, hallucinations, suicidal acts & other issues," Plaintiff advised staff members that he was experiencing chest pains and that he had swallowed a paper clip and a razor blade (*id.*, ¶¶ 2, 3). Nurse Honeycut, who is not named as a Defendant in the sixth amended complaint, knew of Plaintiff's condition but did nothing about it (*id.*, ¶ 4).[5] Due to Nurse Honeycut's inaction, Plaintiff "remained in pain, agony, distress & sufferation [sic] from the ingested items piercing and cutting [Plaintiff's] insides." (*Id.*, ¶ 5).

Sometime later on January 12, 2010, after Plaintiff was discovered lying on the floor of his cell, Temples, Nelson, and Kelley entered Plaintiff's cell (doc. 125, Statement of Facts, ¶¶ 6, 7).[6] Kelley "was not authorized & trained to bite inmates when restraining them, but nonetheless, intentionally & recklessly bit [Plaintiff's] arm for several seconds to cause unbearable pain, anguish & possible d[i]seases(es)" (*id.*, ¶ 8). Kelley "knowingly broke [Plaintiff's] skin open with the force of his teeth to cause bleeding & intrude [on Plaintiff's] person with his bodily fluids" (*id.*, ¶ 9). While mixing his "bodily fluids with [Plaintiff's], Kelley took some of [Plaintiff's] blood & flesh without [Plaintiff's] consent & justification (*id.*, ¶ 10).[7]

---

[4] Many of the allegations in the sixth amended complaint pertain to the unserved Defendants or persons who are not named as Defendants. Such allegations are included in this section, as they may be helpful in placing into context Plaintiff's factual assertions and claims involving Defendants Temples and FDOC and also to assess the viability of the claims against the other Defendants.

[5] Plaintiff states that "[a]ll parties mention[ed] herein, not listed as Defendants, may be called as witness(es) if alive & located" (*id.*, ¶ 80). The court concludes from this assertion that Plaintiff's failure to name as Defendants persons whose conduct is described in the sixth amended complaint is not an oversight but rather is intentional and purposeful.

[6] Plaintiff asserts generally in the sixth amended complaint that "[p]arties identified in the same paragraph herein were acting in nearly identical conduct" (doc. 125, Statement of Facts, ¶ 78).

[7] In the sixth amended complaint Plaintiff does not initially describe any physical interaction with Temples or Nelson, who entered the cell with Kelley. Later in the complaint, however, Plaintiff states that he was subjected

Immediately after the incident, Plaintiff was removed from his cell and placed in restraints nearby on the floor, where he "posed no threat nor displayed any erratic, unruly or dangerous behavior at that point" (doc. 125, Statement of Fact, ¶ 11).  Morris arrived on the scene and "placed his knee hard against [Plaintiff's] head that was pressed against the floor to cause harm, while extending [Plaintiff's] arm[s] beyond the range of motion intentionally for a lengthy period"; Morris also made "death threats" against Plaintiff, even as Plaintiff was "screaming and yelling from the pain and anguish from the assault & battery while the ingested bodies pierced his stomach" (*id.*, ¶¶ 12, 13).  Morris' actions were "NOT rapid, spontaneous, that concluded quickly where interference by other staff was [not] possible during the LENGTHY abuse [sic]" (*id.*, ¶ 15) (emphasis in original).  Hammontree, Temples, Nelson, and Kelley "were present & in a position with a realistic opportunity to prevent [ ] Moore from abusing [Plaintiff] but did not intervene due to a long-standing custom of staffs' non-interference in staff abusing inmates, which Capt. Hammontree condoned." (*Id.* ¶ 14).

 Collier arrived at the location and began operating a portable video/audio recording camera (doc. 129, Statement of Facts, ¶ 16).  CO David Leighty, who is not named as a Defendant in this case, also arrived bringing a spit shield which was placed on Plaintiff's head even though Plaintiff did not spit at anyone or pose any penological threat requiring a spit shield (*id.*, ¶ 17); FDOC records continue to reflect that Plaintiff "spat on staff" although Plaintiff has not received any notice, hearing, or "basis of decision" regarding this contention (*id.*, ¶ 18).

Plaintiff was taken to the medical department, where Nurse Honeycut failed to conduct a full, post use-of-force assessment and document all of Plaintiff's injuries, although Nurse Honeycut's report falsely indicates that he had done so (doc. 129, Statement of Facts, ¶¶ 19–21).  Nurse Honeycut also refused to treat or refer Plaintiff for the assessment or care of the bite wound (which Nurse Honeycut falsely identified as a bruise), his head and arm injuries, or Plaintiff's ingestion of foreign bodies (*see id.*, ¶¶ 22–35).  When Plaintiff was removed from the medical department, Warden Tifft

---

to abuse by staff members for "allegedly assaulting Nelson" during the incident (doc. 129, ¶ 68).  This statement apparently references an interaction with Nelson that occurred during the same scuffle in which Plaintiff asserts Kelley bit him.  Such an assumption is supported by the allegation Plaintiff made in his initial complaint, signed under penalty of perjury, that when the officers entered Plaintiff's cell "an altercation ensued & Officer Nelson got hurt" (doc. 1 at p. 13).

(who is not named as a Defendant) and Hammontree were present and saw the bite wound on Plaintiff's arm because Plaintiff brought it to their attention (*id.*, ¶ 36), but SRCI and Hammontree did not take any photographs of the wound or take any other action (*id.*, ¶ 37). Kelley, Nelson, Temples, and Morris "did not write authentic incident reports about Kell[e]y's bite & Morris' assault & battery that they witnessed, to deprive [Plaintiff] of favorable Brady evidence & not incriminate themselves" (*id.*, ¶ 38).

SRCI and FDOC relied on the "fraud" of Kelley, Nelson, Temples, and Morris concerning the January 12, 2010, incident to deny Plaintiff adequate medical care for the bite wound and so as to not punish the "culprits" (doc. 129, Statement of Facts, ¶ 39). SRCI and Hammontree neither transferred Plaintiff to another location nor assigned Temples, Nelson, Kelley, and Morris to duties not involving the supervision of Plaintiff, causing Plaintiff "to live in a state of constant fear for his life, safety, well being & health" (*id.*, ¶¶ 40, 41).

Warden Tifft, Ealum, Hammontree, Mitchell, Turner, Morris, and Collier escorted Plaintiff back to his cellblock, where they placed him on strip-cell, or restricted property, status (doc. 129, Statement of Facts, ¶ 43). Collier turned off the video recorder but did not retain the tape for longer than thirty days (*see id.*, ¶ 44). Plaintiff was placed on strip-cell status—for allegedly assaulting Nelson rather than for having swallowed foreign objects—with only a "suicide shroud" to wear and without advance notice or a hearing, in extremely cold and uncomfortable conditions, including the denial of such amenities as a mattress, blanket, cup, and hygiene items (*see id.*, ¶¶ 45–47).[8] Plaintiff had to sleep "stooping down on the cold floor," sitting against the wall, or lying on the cold floor (*id.*, ¶¶ 48–50). Sometimes he slept "naked lying down using his shroud as a pillow or kept his shroud on his body & used his cold tired numb and painful arms & hands as a pillow to keep his aching head off the extremely cold floor" (*id.*, ¶ 51).

On January 13, 2010, Dr. Miller—a psychologist not named as a Defendant who authorized the strip-cell restrictions to which Plaintiff was subjected—told Plaintiff he would not be transferred

---

[8] In his first five complaints Plaintiff indicated he was placed on strip-cell status for several days and nights or more than seventy-two hours (docs. 1 at p. 15; 27 at p. 10; 67 at p. 10; 88 at p. 9; and 96 at p. 11). In the fifth and sixth amended complaints, however, Plaintiff states that he remained in the cold strip-cell "for longer than 72 hours (weeks) . . . ." (docs. 106 at p. 11; 125, Statement of Facts, ¶ 47).

to another facility after Plaintiff's alleged assault on staff [Nelson] but would remain at SRCI in close management (doc. 125, Statement of Facts, ¶¶ 52, 53). Dr. Miller knew that Plaintiff was not receiving appropriate mental health care for his serious mental disorders at SRCI but did nothing about it (*id.*, ¶¶ 54, 55); Dr. Miller also overruled another psychiatrist's recommendation to transfer Plaintiff to a different facility (*id.*, ¶¶ 56, 57).

On approximately January 19, 2010, Bishop drew a blood sample from Plaintiff "for d[i]sease testing" after Plaintiff made repeated demands and complaints "about catching d[i]seases from Kelley's bite" (doc. 125, Statement of Facts, ¶ 58); Orsa photographed the bite the same day but did not save the photographs longer than thirty days (*id.*, ¶ 59). Dr. Pacheco, Nurse Carter, and Nurse Thames (respectively, a since-deceased physician and two nurses—none of whom are named as Defendants) as well as Nurse Honeycut, Grice, and Bishop "refused to disclose the test results" to Plaintiff and "provide adequate care if infected as agreed," stating that the results were "unavailable" (*id.*, ¶ 60). "As a result, [Plaintiff] remains in a state of anxiety, fear, stress & depression as to whether he contracted d[i]sease(s) from Kelley" (*id.*, ¶ 61). Dr. Pacheco also falsified documents to reflect that Plaintiff inserted a paper clip into his rectum, as attempted justification for not treating Plaintiff for the foreign bodies he swallowed on January 12, 2010 (and thus defaming Plaintiff as a "sodomite"), and Dr. Pacheco refused to refer Plaintiff to a specialist for removal of the foreign bodies (*id.*, ¶¶ 63, 65).

Based on Warden Tifft's personal knowledge and complaints and other information relayed to it, SRCI knew that its employees were abusing Plaintiff and failing to provide him needed medical care in retaliation for his alleged assault on Nelson (doc. 125, Statement of Facts, ¶¶ 66–67). SRCI inspectors participated in the investigations concerning the events of January 12, 2010, but falsified statements and documents and failed to save videos and photos of the abuses "to deny [Plaintiff] favorable Brady evidence," prevent him from receiving appropriate medical care, and protect "the culprits" (*see id.*, ¶¶ 72, 73). The FDOC was also aware of the abuses suffered by Plaintiff "via phone calls & complaints via letters & emails . . . ." but failed to act (*id.*, ¶¶ 68, 71). Neither the FDOC nor SRCI "provided adequate care, custody & control as agreed concerning [Plaintiff]" (*id.*, ¶ 75). "Had [Plaintiff] been accommodated in his special needs, he could have benefitted from the

corrections programs . . . rather than harmed" (*id.*, ¶ 76). The "harm" Plaintiff alleges he suffered includes "bodily injuries, resulting pains, disabilities, permanent disfigurement, aggravation of existing condition, humiliation, mental anguish & emotional distress . . . " (*id.*, ¶ 77).

Based on these allegations, Plaintiff asserts numerous claims under federal and state law against the various Defendants. Plaintiff's federal claims against Temples are that he failed to intervene to protect him from Morris' use of excessive force, in violation of the Eighth Amendment, and that he denied him "Brady evidence of reports," in violation of the Fourteenth Amendment (doc. 125, Statement of Claims, ¶¶ 3, 6). With respect to the FDOC, Plaintiff asserts that—apparently based on the alleged refusal of Grice and Bishop to disclose his blood test results—a violation of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy Act ("PA"), 5 U.S.C. § 552(a). Plaintiff further claims that FDOC's failure to accommodate his disabilities with appropriate services, care, activities, and programs—but "instead abusing & victimizing him"—violated Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq*., and the Rehabilitation Act ("RA"), 29 U.S.C. § 794. Plaintiff also claims that both Temples and the FDOC violated various provisions of the Uniform Commercial Code ("UCC").

Plaintiff seeks extensive relief, including an injunction requiring the FDOC to provide him with adequate medical care for stomach problems, shoulder pain, and mental issues; conduct tests for blood-borne diseases and disclose the results to Plaintiff in writing; correct administrative records; require staff to stop harassing Plaintiff; and release him into the general population (doc. 129, Relief Requested, at p. 18). Plaintiff also demands "[d]amages including: compensatory, punitive, mental/emotional [and] nominal," as well as declaratory relief, costs, attorneys' fees, the appointment of counsel, and any other relief the court deems appropriate (*id.*).

III.  MOTION TO SET ASIDE DEFAULT AND MOTION FOR DEFAULT JUDGMENT

As referenced above, on December 19, 2013, the clerk entered a default against Grice, after she was served with process on September 25, 2013, but failed to timely plead or otherwise defend

(*see* docs. 138; 139).  On December 26, 2013, Grice moved to set the default aside pursuant to Fed. R. Civ. P. 55(c), citing excusable neglect (doc. 142).[9]  Plaintiff opposes the motion (doc. 152).

Under Rule 55(c), a default may be set aside for "good cause."  In determining whether "good cause" exists, courts focus on three factors: "(1) whether the default was culpable or willful; (2) whether setting it aside would prejudice the non-defaulting party; and (3) whether the party in default has a meritorious defense."  *See* Compania Interamericana Export–Import, S.A. v. Compania Dominicana de Aviacion, 88 F.3d 948, 951 (11th Cir. 1996).  These factors are not "talismanic," however, and courts may also examine other factors, such as whether the defaulting party acted promptly to correct the default. *See, e.g.,* Dierschke v. O'Cheskey, 975 F.2d 181, 184 (5th Cir. 1992). "Whatever factors are employed, the imperative is that they be regarded simply as a means of identifying circumstances which warrant the finding of 'good cause' to set aside a default." *Id.*

The court is satisfied that good cause exists in this case to set aside the default entered against Grice.  In addition to Grice's acting promptly once the default was entered, her claimed actions leading up to entry of the default, *see* n.9, *supra*, should not be deemed culpable.  Also, Plaintiff will not be prejudiced by setting the default aside because, as outlined below, he has failed to state a claim for relief against Grice.  *See* Chudasama v. Mazda Motor Corp., 123 F.3d 1353, 1370 n.41 (11th Cir. 1997) ("[A] default judgment cannot stand on a complaint that fails to state a claim."); Descent v. Kolitsidas, 396 F. Supp. 2d 1315, 1316 (M.D. Fla. 2005) ("[T]he defendants' default notwithstanding, the plaintiff is entitled to a default judgment only if the complaint states a claim for relief.").  The court therefore recommends that Grice's motion to set aside the default be granted and that Plaintiff's motion for default judgment be denied as moot.

IV.     DISCUSSION

---

[9] In part, Grice contends that her counsel was unaware that she had been served with process as she made no request for counsel at the time of service.  As soon as the default was entered, however, counsel contacted Grice, who apparently informed him that due to the impending privatization of FDOC health services she did not know what steps to take when served, and two inquiries to her supervisors in this regard went unanswered.  When advised by counsel of the appropriate actions to take, and upon receipt of authorization from the FDOC to represent Grice, counsel immediately filed the instant motion (*see* doc. 142 at 2).

In their Rule 12(b)(6) motion Temples and the FDOC make numerous arguments for dismissal of Plaintiff's claims. They argue that Plaintiff's claims are barred because he failed to allege the requisite physical injury under 42 U.S.C. § 1997e(e); they are entitled to Eleventh Amendment immunity; Plaintiff failed to state a claim for the failure to intervene in the excessive use of force, to preserve evidence as required by <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), or for supervisory liability; that Plaintiff's UCC, state law commercial and contract claims, ADA, RA, and outrage claims should be dismissed because they are insufficiently pleaded; and the Constitution and criminal statutes of the State of Florida create no private right of action. In a lengthy response, Plaintiff challenges each of Defendants' grounds for dismissal or limitation on the relief he seeks (doc. 141).[10] To the extent it deems warranted, the court addresses the parties' arguments, below.

<u>Limitation on Recovery and Eleventh Amendment Immunity</u>

Title 42 U.S.C. § 1997e(e) provides: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." The Eleventh Circuit has decided that the phrase "Federal civil actions" means all federal claims, including constitutional claims. <u>Napier v. Preslicka</u>, 314 F.3d 528, 532 (11th Cir. 2000) (citing <u>Harris v. Garner</u>, 216 F.3d 970, 984–85 (11th Cir. 2000) (<i>en banc</i>)). Where a prisoner plaintiff alleges constitutional violations he is prevented under § 1997e(e) from seeking punitive or compensatory damages in the absence of a physical injury. <u>Smith v. Allen</u>, 502 F.3d 1255, 1271 (11th Cir. 2007) <i>abrogated on other grounds by</i> <u>Sossamon v. Texas</u>, ____U.S.____, 131 S. Ct. 1651, 179 L. Ed. 2d 700 (U.S. 2011)); <i>see also</i> <u>Al-Amin v. Smith</u>, 637 F.3d 1192, 1199 (11th Cir. 2011) (noting that <u>Napier</u> court, by affirming dismissal of Napier's entire claim, "concluded, albeit <i>sub silentio</i>, that Napier's punitive claim was barred by § 1997e(e)

---

[10] Plaintiff also challenges Temples and the FDOC's filing of a motion to dismiss the complaint instead of a responsive pleading (<i>see</i> doc. 141 at 1–2). Defendants' Rule 12(b)(6) motion is proper response to the complaint, notwithstanding any omission in the court's service order regarding the propriety of filing such a motion (<i>see</i> doc. 109). <i>See</i> Fed. R. Civ. P. 12(b) (authorizing defendant to assert by motion various defenses to claim for relief). Additionally, the court's summonses state that either an answer or a motion under Rule 12 may be served in response to the complaint.

just as much as his compensatory claim.").  Nominal damages, however, may still be recoverable. Smith, 502 F.3d at 1271.

"In order to avoid dismissal under § 1997e(e), a prisoner's claims for emotional or mental injury must be accompanied by allegations of physical injuries that are greater than *de minimis*." Mitchell v. Brown & Williamson Tobacco Corp., 294 F.3d 1309, 1312–13 (11th Cir. 2002); *see also* Mann v. McNeil, 360 F. App'x 31, 32 (11th Cir. 2010) (holding that § 1997e(e) barred inmate's claims for monetary damages; inmate's complaints of vague injuries to his back and scrapes and marks on his knees and legs did not amount to more than *de minimis* physical injury); Nolin v. Isbell, 207 F.3d 1253, 1258 n.4 (11th Cir. 2000) (bruises received during an arrest were non-actionable *de minimis* injury); Quinlan v. Personal Transp. Servs. Co., 329 F. App'x 246, 249 (11th Cir. 2009) (holding that § 1997e(e) barred pre-trial detainee's claims for compensatory and punitive damages; complaints of temporary chest pain, headache and difficulty breathing while in transport van, as well as subsequent "continuous back pain in [his] lower back that periodically cause[d] [him] to walk hunched over," did not constitute more than *de minimis* physical injury required under § 1997e(e), since none of the conditions required immediate medical attention or evidenced physical injury besides discomfort).

Plaintiff in this case contends that as a result of the complained-of conduct he has suffered "pains, disabilities, permanent disfigurement, aggravation of existing conditions . . . , which are more than *de minimis*" (doc. 125, Statement of Facts, ¶ 77).  More specifically, Plaintiff asserts that Kelley's bite broke the skin, which resulted in bleeding, and caused Plaintiff "unbearable" pain (*id.*, ¶¶ 8, 9); that Morris' use of force caused him to suffer "pain in his shoulders and head even to date," as well as dizziness and a need to lie down, and difficulty sleeping on his shoulders, exercising, participating in mental health therapy sessions, and lifting heavy items" (*id.*, ¶¶ 26, 27); that his placement on strip-cell status under severe conditions caused him to experience pain, swelling, itching, and numbness in his feet and legs, including in the location where a bullet is lodged in his leg (*id.*, ¶ 48); and that his ingestion of foreign bodies—which has gone untreated—caused him to experience stomach pains and cramps at the time and, subsequently, to experience indigestion, regurgitation, and acid reflux that could potentially cause esophageal cancer, as well as problems

sleeping while lying down, bending, and performing exercises that require the head to be placed below the stomach (*id.*, ¶ 34).

The court concludes that none of the above allegations implicates physical injuries that rise above the *de minimis* level. The only assertion that even arguably might suggest a physical injury that is more than *de minimis* concerns the alleged bite by Kelley. Here, although Plaintiff complains that he suffered visible injury to his arm from the bite wound (which injury he says was not properly documented or treated at the time of the incident), he does not allege that subsequent to January 12, 2010, the wound needed medical treatment. Even if Plaintiff had so alleged, he does not contend that he has suffered any serious lasting injuries from the alleged bite—only that he fears he could have, which is why he wants to be tested for blood-borne diseases. Fears or concerns, of course, do not constitute physical injury. Based on Plaintiff's allegations of a minimal wound which apparently healed satisfactorily even without treatment, the court concludes that the alleged bite wound injury should be considered *de minimis* in nature. *See, e.g.,* Lassiter v. Reece, Case No. 3:07–885–HFF–JRM, 2008 WL 2852164, at *5 (D.S.C. July 22, 2008) (finding only *de minimis* injury where plaintiff received first aid treatment for dog bite wound but required no further treatment); Jones v. Vaughn, Case No. A.04-1912, 2005 WL 1971869, at *7 (E.D. Pa. Aug. 16, 2005) (human bite mark on chest and abrasions on hand and arm were "constitutionally *de minimis*"); Martin v. Mathena, Case No. 7:08–cv–573, 2009 WL 150864, at *1–2 (W.D. Va. Jan. 21, 2009) (excessive force claim by inmate claiming that guard dog bit him three times, resulting in scratch to elbow and small amount of blood, dismissed for failure to state more than *de minimis* injury); Mickle v. Ahmed, 444 F.Supp. 2d 601, 620 (D.S.C. 2006) (excessive force claim as a result of use of police dog in effecting arrest dismissed as *de minimis* use of force because plaintiff suffered no complications from dog bite and needed no medical attention after initial treatment). Accordingly, the court concludes that § 1997e(e) should bar Plaintiff from seeking punitive or compensatory damages for mental or emotional injury in this case arising from the alleged bite wound or from any other alleged injuries.

With respect to Eleventh Amendment immunity, absent waiver or express congressional abrogation, the Eleventh Amendment prohibits a suit brought by a private individual against a state in federal court. *See* Federal Maritime Commission v. South Carolina State Ports Authority, 535 U.S.

743, 765–78, 122 S. Ct. 1864, 152 L. Ed. 2d 962 (2002); <u>Kentucky v. Graham</u>, 473 U.S. 159, 167, n.14, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985); <u>Gamble v. Florida Department of Heath and Rehabilitative Services</u>, 779 F.2d 1509, 1511 (11th Cir. 1986). A suit against a state employee in his or her official capacity is deemed to be a suit against the state for Eleventh Amendment purposes. <u>Will v. Michigan Dept. of State Police</u>, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989). Thus, all of the individual Defendants named in the sixth amended complaint are immune from a suit for damages in their official capacities. Moreover, a State's Eleventh Amendment immunity extends to "arms of the State." *See* <u>Regents of the Univ. of California v. Doe</u>, 519 U.S. 425, 429–30, 117 S. Ct.. 900, 137 L. Ed. 2d 55 (1997). The FDOC, which is an arm of the State of Florida, administers SRCI. Accordingly, the FDOC and SRCI are also entitled to Eleventh Amendment immunity from damages.

<u>Rule 12(b)(6)</u>

A complaint is subject to dismissal under Rule 12(b)(6) if it fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Pursuant to Rule 8(a)(2), the complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The Supreme Court has held that "[w]hile a complaint attacked by a 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above a speculative level." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (internal citations omitted).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quotation marks omitted). A claim is plausible on its face where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility means "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks omitted). When considering a

motion to dismiss for failure to state a claim, the court must accept all allegations in the complaint as true and construe the facts in the light most favorable to the plaintiff. Lopez v. Target Corp., 676 F.3d 1230, 1232 (11th Cir. 2012). The court is not, however, bound to accept as true "'a legal conclusion couched as a factual allegation.'" Iqbal, 556 U.S. at 678 (citation omitted). Although pro se pleadings are held to a less stringent standard than pleadings drafted by attorneys and are liberally construed, Bingham v. Thomas, 654 F. 3d 1171, 1175 (11th Cir. 2011), in civil rights cases "[m]ore than mere conclusory notice pleading is required . . . ." Gonzalez v. Reno, 325 F.3d 1228, 1235 (11th Cir. 2003) (citation and internal quotation marks omitted). A civil rights complaint will be dismissed as insufficient where the allegations it contains are vague and conclusory. *Id.*

### Defendant Temples

To assess whether Plaintiff's allegations that Temples failed to intervene in the use of excessive force by Morris, the court first considers whether Plaintiff's allegations state a claim of the use of excessive force by Morris.

Claims of excessive force by prison officials fall under the Eighth Amendment's proscription against cruel and unusual punishment. The standard applied to Eighth Amendment claims has a subjective and an objective component. As to the objective component, "not every malevolent touch by a prison guard gives rise to a federal cause of action." Wilkins v. Gaddy, 559 U.S. 34, 37, 130 S. Ct. 1175, 1178 (2010) (citing Hudson v. McMillian, 503 U.S. 1, 9, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992)). An inmate who complains of a "push or shove" that causes no discernible injury almost certainly fails to state a valid excessive force claim. Hudson, 503 at 9 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" Hudson, 503 U.S. at 10 (citation omitted). Accordingly, the Eleventh Circuit requires that the plaintiff suffer more than a *de minimis* injury to establish an Eighth Amendment violation, although courts must remain mindful that significant injury is not required. Johnson v. Breeden, 280 F.3d 1308, 1321 (11th Cir. 2002). Under the subjective component, to sustain an Eighth Amendment challenge it must be shown that prison officials' actions amounted to an "unnecessary and wanton infliction of pain." Whitley v. Albers, 475 U.S. 312, 319, 106 S. Ct. 1078, 1084, 89 L. Ed. 2d 251 (1986). "Force is deemed

legitimate in a custodial setting as long as it is applied 'in a good faith effort to maintain or restore discipline [and not] maliciously and sadistically to cause harm.'" Skrtich v. Thornton, 280 F.3d 1295, 1300 (11th Cir. 2002) (quoting Whitley, 475 U.S. at 320–21). In determining whether an application of force was applied maliciously and sadistically to cause harm, a variety of factors are considered including these five: "the need for the application of force; the relationship between that need and the amount of force used; the extent of the threat to the safety of staff and inmates, as reasonably perceived by officials; the extent of injury; and any efforts made to temper the severity of the response." Hudson, 503 U.S. at 7–8; *see also* Whitley, 475 U.S. at 321; Campbell v. Sikes, 169 F.3d 1353, 1375 (11th Cir. 1999).

If an officer, whether supervisory or not, fails or refuses to take reasonable steps to protect the victim of another officer's use of excessive force, the officer may be held liable for the other officer's malfeasance under § 1983. *See* Hadley v. Gutierrez, 526 F.3d 1324, 1330 (11th Cir. 2008) (citing Velazquez v. City of Hialeah, 484 F.3d 1340, 1341 (11th Cir. 2007)). The non-intervening officer must, however, have been in a position to intervene yet failed to do so. *See id.* at 1331 (citation omitted).

Plaintiff alleges that, while he lay on the ground in restraints outside his cell, Morris held Plaintiff's head "hard" against the floor with his knee while "extending [Plaintiff's arm[s] beyond the range of motion intentionally for a lengthy period . . ." (doc. 129, Statement of Facts, ¶¶ 12, 25). This use of force, Plaintiff contends, caused him to suffer "pain in his shoulders and head even to date," as well as dizziness and a need to lie down, and difficulty sleeping on his shoulders, exercising, participating in mental health therapy sessions, and lifting heavy items" (*id.*, ¶¶ 26, 27). These allegations suggest little in the way of a discernible injury. Moreover, the type of force Plaintiff alleges Morris used against him—pressing the unresisting Plaintiff's head "hard" to the floor and positioning his handcuffed wrists upward beyond the normal range of shoulder motion—is "not of a sort repugnant to the conscience of mankind." *See* Hudson, 503 U.S. at 10 (quotation marks omitted). Rather, this force is more akin to that involving a "push or shove" which, as Hudson explained, is insufficient to state a valid excessive force claim absent discernible injury. *See* Smith v. Secretary Dept. of Corrections, 524 F. App'x 511, 514 (11th Cir. 2013) (affirming summary judgment in defendant's favor on prisoner plaintiff's claim that defendant twisted his handcuffed arms upwards

and pressed him against wall "for some minutes"; plaintiff suffered no serious injury and alleged conduct was similar to a "push" or "shove," which is not conduct "of a sort repugnant to the conscience of mankind") (citation and internal quotation marks omitted). Accepting Plaintiff's allegations against Morris as true and construing them in the light most favorable to Plaintiff, as it must in a motion to dismiss, the court concludes they do not implicate a use of force that was more than *de minimis* in nature. Plaintiff's allegations thus fail to state an Eighth Amendment claim of the use of excessive force against Defendant Morris.[11] Consequently, Plaintiff's claim that Temples failed to intervene to stop an unlawful use of force by Morris likewise fails.

Plaintiff's allegation that Temples and others "intentionally & knowingly did not write authentic incident reports about Kelley's bite & Morris' assault & battery . . . to deprive [Plaintiff] of favorable Brady evidence & not incriminate themselves" (doc. 125, Statement of Facts, ¶ 38) is insufficient to state a due process claim. The due process clause of the Fourteenth Amendment guarantees that no person may be deprived "of life, liberty, or property, without due process of law." U.S. Const. XIV, § 1. The essence of the requirements of procedural due process under the Fourteenth Amendment is reasonable notice and a fair opportunity to be heard. *See* Mathews v. Eldridge, 424 U.S. 319, 333–34, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). Here, Plaintiff's vague and conclusory assertion that Temples submitted a false incident report is not enough to suggest that Temples deprived him of notice and an opportunity to be heard at a meaningful time and in a meaningful manner with respect to the disputed events of January 12, 2010, which Temples allegedly witnessed, participated in, and/or reported on. Mere allegations of falsified misconduct or evidence reports, without more, are not enough to state a due process claim upon which relief may be granted. Smith v. Mensinger, 293 F.3d 641, 654 (3d Cir. 2002); Freeman v. Rideout, 808 F.2d 949, 951 (2nd Cir. 1986) (prisoners have no constitutional immunity from being falsely or wrongly accused of conduct that results in deprivation of protected liberty interest). Plaintiff also fails to identify the process he believes he was due and what, if any, harm he suffered as a result of Temples' allegedly false incident report.

---

[11] As to Morris' allegedly making "death threats" against Plaintiff, derogatory, demeaning, profane, threatening, or abusive comments made by an officer to an inmate, no matter how repugnant or unprofessional, do not rise to the level of a constitutional violation. Edwards v. Gilbert, 867 F.2d 1271, 1274 n.1 (11th Cir. 1989).

Additionally, to the extent Plaintiff contends he was deprived of evidence which would support his excessive force and/or other civil rights claims in this case, his reliance on <u>Brady</u> is misplaced. <u>Brady</u> requires prosecutors to disclose material exculpatory evidence to a defendant in order to comply with the constitutional guarantee of procedural due process. This duty arises in the context of criminal proceedings; it does not apply to Plaintiff's claims in this civil rights matter. To the extent Plaintiff contends he was entitled to evidence to defend against any administrative charges stemming from the events of January 12, 2010, any reliance on <u>Brady</u> would again be misplaced. "Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." <u>Wolff v. McDonnell</u>, 418 U.S. 539, 556, 94 S. Ct. 2963, 2974, 41 L. Ed. 2d 935 (1974). Indeed, the Eleventh Circuit has noted, without deciding the issue, that it has never held that the principles of <u>Brady</u> extend to prison disciplinary hearings. <u>Kenney v. Barron</u>, 239 F. App'x 494, 495 (11th Cir. 2007) (*per curiam*). Additionally, a <u>Brady</u> claim which implicates the validity of an accused's conviction cannot be brought in a § 1983 suit but rather must be brought in a petition for habeas corpus. <u>Skinner v. Switzer</u>, 562 U.S. ____, 131 S. Ct. 1289, 179 L. Ed. 2d 233 (2011).

Plaintiff also claims that Temples "breach[ed] [his] agreements, license, oath, & contract to provide adequate care, custody, [and] control" of the incarcerated Plaintiff, in violation of various provisions of the UCC as well as state law. The UCC is simply a model uniform act without independent legislative force that was designed to harmonize the laws of sales and certain other commercial transactions among the fifty states. In some form, all fifty states have adopted the UCC. *See* <u>Linear Tech. Corp. v. Micrel, Inc.</u>, 275 F.3d 1040, 1048 (Fed. Cir. 2001) (the UCC is a model code, enacted with modifications in the several states, which itself does not have the force of law). Thus, to the extent Plaintiff relies on the UCC to base an independent contract claim under federal law, his reliance is misplaced.

For all of the foregoing reasons, the court concludes that Plaintiff's federal claims against Temples fail to state a claim for relief and should be dismissed.

<u>Defendant FDOC</u>

Plaintiff alleges that the FDOC violated the FOIA and the PA by the refusal of Grice and Bishop and others to provide him with his blood test results. As an initial matter, "[s]ection 1983 will

not support a claim based on a *respondeat superior* theory of liability." <u>Marsh v. Butler Cnty., Ala.</u>, 268 F.3d 1014, 1035 (11th Cir. 2001) (quoting <u>Polk Cnty. v. Dodson</u>, 454 U.S. 312, 325, 102 S. Ct. 445, 70 L. Ed. 2d 509 (1981)).  In any event, "the Freedom of Information Act applies only to federal agencies." <u>Nero v. Maryland</u>, 487 F. App'x 89, 90 (4th Cir. 2012).  The statute defines "agency" as "each authority of the Government of the United States," with various exceptions not applicable here. *See* 5 U.S.C. § 551(1).  Defendant FDOC is not an entity of the federal government and thus is not subject to the provisions of the FOIA.  Plaintiff therefore fails to state a claim under the FOIA. Likewise, because the FDOC is not a federal agency and the PA only applies to federal agencies, Plaintiff has failed to state a claim under the PA.  *See* <u>Schwier v. Cox</u>, 340 F.3d 1284, 1287 (11th Cir. 2003) (noting the private right of action created by the Privacy Act only applies to federal agencies).

Plaintiff's allegation that the FDOC failed to accommodate his disabilities with appropriate services, care, activities, and programs, thus violating the ADA and RA, also fails to state a claim for relief.  Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity."  42 U.S.C. § 12132.  Section 504 of the RA states, in relevant part, that, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  Claims under both statutes are governed by the same standards.  *See, e.g.*, <u>Cash v. Smith</u>, 231 F.3d 1301, 1305 n.2 (11th Cir. 2000) ("Cases decided under the Rehabilitation Act are precedent for cases under the ADA, and vice-versa."); *see also* <u>Everett v. Cobb County Sch. Dist.</u>, 138 F.3d 1407, 1409 (11th Cir. 1998).  To state a claim under either statute, a plaintiff generally must show "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." <u>Bircoll v. Miami–Dade Cnty.</u>, 480 F.3d 1072, 1083 (11th Cir. 2007) (citation omitted); *see also* <u>Harris v. Thigpen</u>, 941 F.2d 1495, 1522 (11th Cir. 1991) (applying those elements in the prison context).

At the very least, Plaintiff's ADA and RA claims are deficient because he has failed to assert he was denied a benefit because of his disability. Moreover, Plaintiff's allegations appear to be based primarily on his contention that he was not provided appropriate mental health care. The ADA is not a "remedy for medical malpractice" and is "not [ ] violated by a prison's simply failing to attend to the medical needs of its disabled prisoners." Schiavo v. Schiavo, 403 F.3d 1289, 1294 (11th Cir. 2005) (quoting Bryant v. Madigan, 84 F.3d 246, 249 (7th Cir. 1996)). Nor does the RA provide a federal malpractice tort remedy. Grzan v. Charter Hospital of Northwest Indiana, 104 F.3d 116, 121, 123 (7th Cir. 1997).

To the extent Plaintiff seeks to assert a claim under the UCC against the FDOC, it fails for the same reasons that any such claim against Temples fails.

In summary, the court concludes that Plaintiff's claims against the FDOC under the Freedom of Information Act, the Privacy Act, the Americans with Disabilities Act, the Rehabilitation Act, and the Uniform Commercial Code fail to state a claim for relief and should be dismissed.

## V.    CLAIMS AGAINST THE OTHER DEFENDANTS

Many of the claims Plaintiff asserts against Temples and the FDOC are also asserted against other Defendants and, for the same reasons, should also be dismissed. Accordingly, as against Hammontree, Kelley, and Nelson, Plaintiff's claims for the failure to intervene in the use of excessive force by Morris should be dismissed (doc. 125, Statement of Claims, ¶ 3). Also, because Plaintiff has failed to state a claim for relief for the use of excessive force against Morris, that claim should likewise be dismissed (*id.*). As against SRCI and Hammontree (*id.*, ¶ 5) ("denying Brady evidence of reports"); Kelley, Nelson, and Morris (*id.*, ¶ 6) ("denying Brady evidence of reports"); Collier (*id.*, ¶ 8) ("denying Brady evidence of portable recording"); and Orsa (*id.*, ¶ 9) ("denying Brady evidence of bite photographs"), Plaintiff's procedural due process claims should likewise be dismissed. Additionally, Plaintiff's Freedom of Information Act, Privacy Act, Rehabilitation Act, Americans with Disabilities Act, and Uniform Commercial Code claims against SRCI (which, as noted, the FDOC administers) should be dismissed (*id.*, ¶¶ 11, 12). Plaintiff also asserts the UCC claim against all of the other Defendants, which should also be dismissed as against them.

The remainder of Plaintiff's claims are also due to be dismissed. The court first addresses Plaintiff's claim that Kelley violated the Fourth and Fourteenth Amendments by biting him on the arm (doc. 125, Statement of Claims, ¶ 2) ("biting, mixing fluids with d[is]ease that can deprive life & involuntarily removing [Plaintiff's] person, violated US Const. Amend. 4 & 14 . . . regarding search & seizure and due process - substantive . . . "). While the government's compelled extraction of a blood sample for DNA profiling constitutes a "search," Padgett v. Donald, 401 F.3d 1273, 1277 (11th Cir. 2005) (citing Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 616–17, 109 S. Ct. 1402, 103 L. Ed. 2d 639 (1989)), Kelley's alleged misconduct, properly considered, implicates neither a governmental "search" nor a governmental "seizure" within the meaning of the Fourth Amendment. Furthermore, it is well established that if a constitutional claim is covered by a specific constitutional provision, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process. County of Sacramento v. Lewis, 523 U.S. 833, 843, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998) (citations omitted). The Eighth Amendment's prohibition against cruel and unusual punishment governs a prisoner's claim that a prison official used excessive force. Campbell, 169 F.3d at 1374. In the instant case, as Plaintiff's allegation that Kelley bit him properly sounds as an excessive force claim under the Eighth Amendment, a substantive due process analysis under the Fourteenth Amendment is inappropriate. See Brown v. Smith, 813 F.2d 1187, 1188 (11th Cir. 1987) (holding that the due process clause of the Fourteenth Amendment affords a convicted prisoner no greater protection from excessive force by prison officials than the Eighth Amendment) (citation omitted).

Even though Plaintiff's allegation that Kelley bit him sounds as an excessive force claim, in the sixth amended complaint Plaintiff fails to include an Eighth Amendment claim against Kelley. That Plaintiff is capable of clearly asserting an Eighth Amendment claim when he intends to do so is evident from the specific excessive force claim he makes against Morris (see doc. 125, Statement of Claims, ¶ 3). Additionally, in the third and fourth amended complaints Plaintiff specifically asserted an Eighth Amendment claim against Kelley in connection with the alleged bite (see doc. 88, Statement of Claims, ¶ 4, and doc. 96, Statement of Claims, ¶ 5a), but he omitted the claim from the instant sixth amended complaint. Furthermore, the court has repeatedly given Plaintiff detailed and explicit instructions regarding the requirements of stating an Eighth Amendment claim of the use of excessive

force (doc. 102 at pp. 6–7; *see also* doc. 41 at pp. 2–3; doc. 78 at 3; doc. 90 at pp. 5–6), including specifically with respect to Kelley and Morris (*see* doc. 102 at p. 6). Plaintiff's pleadings and other papers generally contain comprehensive and reasonably articulated and researched (if often unsuccessful) arguments, which appear to leave no stone unturned in what can only be termed Plaintiff's zealous and unflagging quest for relief.

For all of the reasons stated above, the court concludes that Plaintiff's omission in the sixth amended complaint of a claim of the use of excessive force against Kelley was intentional. As it is required to do, the court has construed Plaintiff's pro se pleadings liberally; nevertheless, it is not required to rewrite Plaintiff's sixth amended complaint to include an excessive force claim against Kelley and concludes it need not do so here. *See* GJR Investments, Inc. v. County of Escambia, 132 F.3d 1359, 1369 (11th Cir. 1998). Alternatively, even if the court addresses these allegations in the context of the Eighth Amendment, it concludes that Plaintiff's allegations are insufficient to state a claim of excessive force against Kelley. As discussed above, Plaintiff's assertions do not reflect that he sustained more than *de minimis* injury from the alleged bite.[12] Moreover, the nature of the alleged conduct—a bite that broke the skin and bled—is deserving of condemnation but is not so egregious that it rises to the level of force which should be considered to be repugnant to the conscience of mankind. Hudson, 503 U.S. at 10. Accordingly, a claim of the use of excessive force against Kelley fails.

Next, the court addresses Plaintiff's allegations that Hammontree, Ealum, Mitchell, Turner, Morris, and SRCI were deliberately indifferent to his safety by placing him on strip-cell status and also that they failed to provide him notice or a hearing before doing so, thereby denying him procedural due process (doc. 125, Statement of Claims, ¶ 7; *see also*, *id.*, Statement of Facts, ¶¶ 43, 45). These claims also fail.

---

[12] In Harris v. Garner, 190 F.3d 1279, 1286 (11th Cir. 1999), *reh'g en banc granted and opinion vacated*, 197 F.3d 1059 (11th Cir.1999), *opinion reinstated in relevant part en banc*, 216 F.3d 970 (11th Cir. 2000), the court "join[ed] the Fifth Circuit in fusing the physical injury analysis under section 1997e(e) with the framework set out by the Supreme Court in Hudson for analyzing claims brought under the Eighth Amendment for cruel and unusual punishment, and hold that in order to satisfy section 1997e(e) the physical injury must be more than *de minimis*, but need not be significant."

"[T]he Constitution does not mandate comfortable prisons."  Rhodes v. Chapman, 452 U.S. 337, 349, 101 S. Ct. 2392, 2400, 69 L. Ed. 2d 59 (1981).  "[E]xtreme deprivations are required to make out a conditions-of-confinement claim," "[b]ecause routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society[.]'"  Hudson, 503 U.S. at 9 (citations omitted).  A prison official's duty under the Eighth Amendment is to ensure "reasonable safety," a standard that incorporates due regard for prison officials' "unenviable task of keeping dangerous men in safe custody under humane conditions."  Farmer v. Brennan, 511 U.S. 825, 844–45, 114 S. Ct. 1970, 1983, 128 L. Ed. 2d 811 (1994).  "Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause."  Id.  Prison officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  Bell v. Wolfish, 441 U.S. 520, 547, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979).

To state an Eighth Amendment inhumane conditions of confinement claim, Plaintiff must allege that he was deprived of the minimal civilized measure of life's necessities or subjected to a wanton and unnecessary infliction of pain and that Defendants knowingly disregarded the excessive risk to his health or safety created by such a deprivation.  Farmer, 511 U.S. at 834, 837.  With respect to the objective component, the court should look to "contemporary standards of decency" to determine whether the challenged conditions resulted in a deprivation of "the minimal civilized measure of life's necessities" or "basic human needs."  Rhodes, 452 U.S. at 347.  Plaintiff's allegations that, while on strip-cell status for either days or "weeks,"[13] he was given only a "suicide shroud" to wear; was subjected to cold conditions; denied a mattress, blanket, cup, and hygiene items; slept stooping, sitting, or lying on a cold floor fail to satisfy these requirements.  Inmates have no absolute right to bedding or clothes under the Eighth Amendment.  See Williams v. Delo, 49 F.3d 442, 446 (8th Cir. 1995) ("there is no absolute Eighth Amendment right not to be put in a cell without clothes or bedding"); Beard v. Strength, Case No. CV 108-002, 2008 WL 2754094, *3 (S.D. Ga. July 14, 2008) (finding inmate had no absolute right to bedding).  Moreover, an inmate who alleges he was required to sleep

_____

[13]  As noted, Plaintiff has stated inconsistently that he was kept in a strip-cell for either several days and nights (see docs. 1 at p. 15; 27 at p. 10; 67 at p. 10; 88 at p. 9; 96 at p. 11) or "weeks" (docs. 106 at p. 11; 125, ¶ 47).  Under either scenario, Plaintiff's allegations fail.

on a bare cement floor without a mattress for several days has not stated an Eighth Amendment violation. *See* Fischer v. Ellegood, 238 F. App'x 428, 433 (11th Cir. 2007). "To determine whether conditions of confinement constitute cruel and unusual punishment, the court must look to the effect the condition has upon the inmate." Wiley v. Glover, Case No. 1:05cv1156-MEF, 2008 WL 4629924, *18 (M.D. Ala. Sept. 3, 2008) (citing Rhodes, 452 U.S. at 366). In this instance, although Plaintiff asserts that the cold conditions and sleeping on the floor caused him to experience pain, swelling, itching, and numbness in his feet and legs, including in the location where a bullet is lodged in his leg, these effects appear to be relatively minimal in nature rather than implicate significant physical injuries. Also, Plaintiff does not allege that he required or sought medical care as a result of his living conditions. Under the circumstances alleged by Plaintiff, which are taken as true, the conditions do not rise to the level of a deprivation of the minimal civilized measure of life's necessities or of a basic human need. *Cf.* White v. Marshall, Case No. 2:08cv362-CSC, 2008 WL 4826283, *3, *8–9 (M.D. Ala. Nov. 5, 2008) (holding that the plaintiff's confinement for thirty days in a strip cell with only a drain in the floor for urinating, cold sandwiches three times a day, no clothing except for a paper gown, no mattress for twenty-four days, no blanket, no wash basin, no personal hygiene items, no lightbulb, no ventilation, and no shower or exercise for fourteen days were not deprivations of "the minimal civilized measures of life's necessities."); Mosley v. Bishop, Case No. 07-0692-KD-M, 2009 WL 1564778, *1, *5–6 (S.D. Ala. June 1, 2009) (denial of mattress and bed linens for nine days, which forced inmate to sleep on a "cold, raw steel slab," did not rise to the level of a deprivation of the minimal civilized measure of life's necessities or of a basic human need.); Brown v. Goodman, 2010 WL 2202515, *5–6 (S.D. Ala. 2010) (confinement in strip cell for eight days when it was very cold and plaintiff had to sleep on iron bed frame did not pose "an unreasonable risk of serious damage to his future health or safety."). Because Plaintiff has failed to allege circumstances that would establish a deprivation of "the minimal civilized measures of life's necessities" or being subjected to a wanton and unnecessary infliction of pain, he has failed to meet the objective component of his Eighth Amendment claim. Having concluded that Plaintiff failed to adequately allege the objective component of this claim, the court need not address the subjective component. In short, this claim

should be dismissed because Plaintiff has failed to state an Eighth Amendment conditions of confinement claim based on his temporary confinement on strip-cell status.[14]

Plaintiff's allegations that Hammontree, Ealum, Mitchell, Turner, Morris, and SRCI failed to provide him notice or a hearing before putting him on strip-cell status do not state a due process claim (doc. 125, Statement of Claims, ¶ 7; *see also*, *id.*, Statement of Facts, ¶¶ 43, 45).  First, Plaintiff's conclusory and bald contention that he was put in a strip-cell for assaulting Nelson seems inconsistent with his detailed assertion—which is central to his complaint—that he attempted to self-harm by swallowing a paperclip and a razor blade.  In short, it lacks plausibility.  Rather, it seems more plausible—based on Plaintiff's allegations—that he was placed in a strip-cell for his own protection and safety than placed there for disciplinary reasons.  Regardless, even if to any extent Plaintiff's allegations are sufficient to suggest he was placed in the strip-cell was for disciplinary reasons, he has failed to state a due process claim.

Due process protections are not required unless the discipline at issue imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  Sandin v. Conner, 515 U.S. 472, 484, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995) (prisoners do not have a constitutional right to be placed in a specific security classification, and custodial classifications do not create a major disruption in a prisoner's environment).  Prisoners generally have no constitutional right to remain incarcerated in a specific security classification.  *See* Moody v. Daggett, 429 U.S. 78, 88 n.9, 97 S. Ct. 274, 50 L. Ed. 2d 236 (1976) (rejecting prisoner's argument that a pending warrant and detainer adversely affected his prison classification and qualification for institutional programs because not "every state action carrying adverse consequences for prison inmates automatically activates a due process right").  In Wilkinson v. Austin, 545 U.S. 209, 125 S. Ct. 2384, 162 L. Ed. 2d

---

[14]  To the extent Plaintiff's allegations regarding his placement on strip-cell status should be treated as an excessive force claim under the Eighth Amendment rather than a conditions of confinement claim, the allegations also fail to state a claim for relief.

When the conduct in question "involves any measure taken to prevent a security threat or restore official control, the Eighth Amendment inquiry is whether force was applied in a good faith effort to maintain or restore discipline or inflicted maliciously and sadistically for the very purpose of causing harm."  Sims v. Mashburn, 25 F.3d 980, 984 (11th Cir. 1994).  The "malicious and sadistic" intent requirement is more stringent than the deliberate indifference standard.  Because Plaintiff's allegations do not satisfy the less demanding deliberate indifference standard, they also cannot satisfy the more demanding "malicious and sadistic" standard.

174 (2005), however, the Supreme Court found that inmates did have a liberty interest in avoiding assignment to a state's "supermax" prison. In so finding, the Court carefully distinguished supermax facilities from normal segregation units in three ways: First, inmates in the supermax facility were "deprived of almost any environmental or sensory stimuli and of almost all human contact." Wilkinson, 545 U.S. at 214. Second, they were assigned for "an indefinite period of time, limited only by [the] inmate's sentence." *Id.* Third, once assigned to supermax "[i]nmates otherwise eligible for parole lose their eligibility while incarcerated" at the facility. *Id.* at 215. The Court noted other harsh conditions that might be common to most solitary confinement facilities, such as permitting no conversation between cells, lighting the cells twenty-four hours per day, and limiting exercise to one hour per day in a small indoor room. *Id.* at 224. Unlike other facilities, however, the conditions at the supermax facility included the two other components noted above, which are indefinite placement and disqualification for parole consideration. The Court then stated: "While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context." *Id.* at 224.

In the instant case, while the conditions of Plaintiff's confinement in the strip-cell may have been more restrictive than experienced by inmates elsewhere at SRCI, or even conditions that Plaintiff had previously experienced at SRCI, they come nowhere close to being as restrictive and atypical as those at issue in Wilkinson. Plaintiff's allegations do not reflect that he was subjected to conditions so severe that they imposed significant hardship in the context of prison life. The court therefore concludes that Plaintiff's allegations are not sufficient to show a liberty interest in remaining off strip-cell status. *See* Beverati v. Smith, 120 F.3d 500, 503 (4th Cir. 1997) (holding that administrative segregation for six months with vermin; human waste; flooded toilet; unbearable heat; cold food; dirty clothing, linens, and bedding; longer periods in cell; no outside recreation; no educational or religious services; and less food was not so atypical as to impose significant hardship); Lloyd v. Briley, 2007 WL 917385 (M.D. Ill. 2007) (strip cell with no sheets, toilet paper, or personal property for thirteen days did not give rise to procedural due process claim). Plaintiff's procedural due process claims against Hammontree, Ealum, Mitchell, Turner, Morris, and SRCI therefore fail.

Plaintiff also claims that SRCI and Hammontree failed to move him or reassign to other locations the officers involved in the January 12, 2010, incidents, causing him to live "in a state of constant fear for his life, safety, well being & health" (doc. 125, Statement of Facts, ¶¶ 40, 41). According to Plaintiff, this conduct violated his right to be free of cruel and unusual punishment under the Eighth Amendment and to substantive due process under the Fourteenth Amendment (*id.*, Statement of Claims, ¶ 4). Insofar as these Defendants are properly answerable to this contention, Plaintiff's allegations fail to state an Eighth Amendment claim. They do not suggest that the failure to move Plaintiff to another cell block or reassign the officers involved in the January 12, 2012, incidents posed a substantial risk of serious harm to Plaintiff, much less that SRCI or Hammontree knew of and disregarded an excessive risk to Plaintiff's safety. Farmer, 511 U.S. at 834. No Eighth Amendment claim is stated.[15]

Plaintiff's final claims are against Grice and Bishop for allegedly failing to immediately draw Plaintiff's blood for testing after he was bitten by Kelley and then refusing to disclose the results of the test to Plaintiff (doc. 125, Statement of Claims, ¶ 10). These claims sound in deliberate indifference under the Eighth Amendment.

Prison officials violate the Eighth Amendment when they act with deliberate indifference to an inmate's serious medical needs. Estelle v. Gamble, 429 U.S. 97, 104–05, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). To state a claim of deliberate indifference to a serious medical need, the plaintiff must allege: (1) a serious medical need; (2) the defendant's deliberate indifference to that need; and (3) causation between the defendant's indifference and the plaintiff's injury. Youmans v. Gagnon, 626 F.3d 557, 563 (11th Cir. 2010) (*per curiam*). With respect to the "deliberate indifference" prong of this claim, a plaintiff must allege: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." *Id.* at 564 (quotation marks omitted) (alteration in original). The seriousness of a medical need is an objective inquiry. Kelley v. Hicks, 400 F.3d 1282, 1284 (11th Cir. 2005) (*per curiam*).

---

[15] Because this constitutional claim is covered by the Eighth Amendment, it is not analyzed as a substantive due process claim under the Fourteenth Amendment. *See* County of Sacramento, 523 U.S. at 843; Brown, 813 F.2d at 1188.

A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. In the alternative, a serious medical need is determined by whether a delay in treating the need worsens the condition. In either case, the medical need must be one that, if left unattended, poses a substantial risk of serious harm.

Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1307 (11th Cir. 2009) (citations omitted) (internal quotation marks omitted).

Deliberate indifference is a subjective inquiry. Kelley, 400 F.3d at 1284. To establish deliberate indifference, a plaintiff must allege: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." Youmans, 626 F.3d at 564 (alteration in original) (internal quotation marks omitted). In determining whether an individual exercised gross negligence, the court should consider: (1) indifference by prison doctors or nurses in their response to the prisoner's needs; (2) prison guards intentionally denying or delaying access to medical care; and (3) interference with treatment once proscribed. See Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004). With regard to gross negligence in a delay-of-treatment case, the relevant factors include: "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." Goebert v. Lee County, 510 F.3d 1312, 1327 (11th Cir. 2007). In order for a denial of medical care to rise to the level of deliberate indifference, the treatment must be more than "medical malpractice actionable under state law." Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000) (alteration omitted) (internal quotation marks omitted). Accordingly, a "simple difference in medical opinion" does not constitute deliberate indifference. Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989).

Accepting as true Plaintiff's allegation that Kelley bit him, the court concludes that the time at which a test for blood-borne disease should be obtained—whether immediately or at some prescribed period afterward—involves a matter of medical judgment, not deliberate indifference. Moreover, even if obtaining a blood test following a human bite wound implicates a serious medical need, Plaintiff does not allege that any delay in obtaining the test—or any refusal to advise him of the results of that test—has resulted in physical harm or worsening of a condition. Rather, though no

condition related to a human bite wound has been diagnosed, Plaintiff alleges that he fears such a diagnosis and is anxious because the test was not obtained exactly when he requested and the results were not disclosed to him as he requested. Plaintiff cannot and does not allege that he suffered any physical injury or worsening of a condition as a result of Bishop or Grice's alleged acts or omissions. Accordingly, Plaintiff has failed to state a plausible Eighth Amendment claim against Grice and Bishop.

As set forth above, all of Plaintiff's federal claims are due to be dismissed. Even if Plaintiff sought leave to amend yet again, no further amendment should be permitted. Although Plaintiff has had numerous opportunities to amend his allegations, he has been unable to assert a viable claim despite receiving ample guidance from the court.[16] As Plaintiff has failed, repeatedly, to establish a factual basis for his claims, the court concludes that any further attempts to state a claim would be futile. Dismissal of Plaintiff's federal claims with prejudice therefore is warranted. *See* Cockrell v. Sparks, 510 F.3d 1307, 1310 (11th Cir. 2007) (dismissal with prejudice appropriate if granting leave to amend would be futile).

## VI. STATE LAW CLAIMS

Plaintiff's state law claims should be dismissed without prejudice. It is well established that once a plaintiff's federal claims are dismissed, there remains no independent federal jurisdiction to support the court's exercise of supplemental jurisdiction over state claims against a defendant. *See* Baggett v. First Nat'l Bank of Gainesville, 117 F.3d 1342, 1352 (11th Cir. 1997). Title 28 U.S.C. § 1367(c)(3) provides that the district court may decline to exercise supplemental jurisdiction over claims after it has dismissed all claims over which it has original jurisdiction. *See also* United Mine Workers v. Gibbs, 383 U.S. 715, 725–26, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966). Where § 1367(c) applies, considerations of judicial economy, convenience, fairness, and comity may influence the

---

[16] *See* docs. 41, 78, 90, and 102. The court noted in its order dated May 13, 2013, that "Plaintiff named twenty-two or more Defendants from SRCI and [Union Correctional Institution] in his initial complaint, thirty-three Defendants in his amended complaint, forty-four Defendants in his Second Amended Complaint, and seventeen Defendants in his Third Amended Complaint. Thus, Plaintiff's allegations have undergone a significant metamorphosis since the initial complaint." (doc. 102 at 2 n.3).

court's discretion to exercise supplemental jurisdiction. <u>Baggett</u>, 117 F.3d at 1353 (citing <u>Palmer v. Hosp. Auth. of Randolph Cnty.</u>, 22 F.3d 1559, 1569 (11th Cir. 1994); <u>Exec. Software N. Am. v. United States Dist. Court</u>, 15 F.3d 1484, 1493 (9th Cir. 1994); <u>New England Co. v. Bank of Gwinnett Cnty.</u>, 891 F. Supp. 1569, 1578 (N.D. Ga. 1995); <u>Fallin v. Mindis Metals, Inc.</u>, 865 F. Supp. 834, 841 (N.D. Ga. 1994)).  Taking these factors into account in this case, the undersigned concludes that Plaintiff's state law claims should be dismissed.[17]  The state court is best equipped

to research and rule on matters of state law, and principles of comity suggest that it be allowed to do so.

VII.     CONCLUSION

For the reasons set forth above, the court concludes that  Grice's motion to set aside default should be granted, and Plaintiff's motion for default judgment should be denied.  Additionally, the motion to dismiss filed by Defendants Temples and FDOC should be granted and the federal claims against these Defendants should be dismissed with prejudice.  In addition, all federal claims against the remaining Defendants should also be dismissed with prejudice.  Plaintiff's state law claims against all Defendants should be dismissed without prejudice to his pursuing them in state court.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That Grice's motion to set aside default (doc. 142) be **GRANTED.**

2.      That Plaintiff's motion for default judgment against Grice (doc. 153) be **DENIED**, as moot.

---

[17] Dismissal of Plaintiff's state claims without prejudice should not result in unfairness to any party.  While the case is aged, no discovery has yet been conducted and many of the Defendants have not even been served.  Also, the period of limitations has been tolled during the pendency of this action and will continue to be tolled for a period of at least thirty days after dismissal. *See* 28 U.S.C. § 1367(d).  *See also* <u>Krause v. Textron Financial Corp.</u>, 59 So. 3d 1085  (Fla. 2011) (finding that § 1367(d) tolled Florida's statute of limitations applicable to constructive trust claim, and approving <u>Scarfo v. Ginsberg</u>, 817 So. 2d 919 (Fla. 4th DCA 2002) (concluding that dismissal of a federal claim for lack of subject matter jurisdiction did not bar application of § 1367(d) to toll state limitations period for claims refiled in state court)); <u>Blinn v. Florida Dept. of Transportation</u>, 781 So. 2d 1103 (Fla. 1st DCA 2000) (§ 1367(d) applied to toll employee's claims initiated in federal court, then voluntarily dismissed before filing in state court).  Thus, following dismissal, Plaintiff should  have adequate time to file his state claims in state court if he wishes.

Case No.: 3:10cv360/LAC/EMT

3.      That the motion to dismiss filed by Defendants Temples and FDOC (doc. 129) be **GRANTED** and the federal claims against these Defendants be dismissed, with prejudice.

4.      That all federal claims against Defendants Kelley, Nelson, Morris, Hammontree; Orsa; Turner; Ealum; Mitchell; Collier; Grice; Bishop, and SRCI, also be dismissed, with prejudice.

5.      That Plaintiff's state law claims against all Defendants be dismissed, without prejudice to Plaintiff's pursuing them in state court.

6.      That any other pending motions be **DENIED**, as moot.

7.      That the clerk be directed to enter judgment in favor of Defendants and against Plaintiff and close the file.

At Pensacola, Florida, this 31st day of January 2014.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof. Any different deadline that may appear on the electronic docket is for the court's internal use only. A copy of objections shall be served upon the magistrate judge and all other parties. Failure to object may limit the scope of appellate review of factual findings.** *See* **28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**